IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————————————

| | | |
|---|---|---|
| MICHELE OWEN BLACK | : | |
| 1155 Lark Song Lane | : | |
| Encinitas, CA 92024 | : | |
| _Plaintiff_ | : | |
| | : | CIVIL ACTION NO: |
| v. | : | |
| | : | |
| MONTGOMERY  COUNTY | : | JURY TRIAL DEMANDED |
| DET. JOHN T. FALLON | : | |
| One Montgomery Plaza - Suite 800 | : | |
| Norristown, PA 19404 | : | |
| and | : | |
| LOWER MERION TOWNSHIP, | : | |
| DET. GREGORY HENRY, | : | |
| DET.  BRYN GARNER, | : | |
| CHIEF FIRE OFF. CHARLES McGARVEY, and | : | |
| DEP. FIRE MARSHALL FRANK HAND | : | |
| 75 East Lancaster Avenue | : | |
| Ardmore, PA 19003-2323 | : | |
| and | : | |
| STATE TROOPER ROBERT POMPONIO | : | |
| 2047 Bridge Rd | : | |
| Schwenksville, PA 19473 | : | |
| _Defendants._ | : | |

———————————————————

## SECOND AMENDED COMPLAINT

1.      This is an action for money damages brought pursuant to 42 U.S.C. §§ 1983 and 1988.

and the Fourth and Fourteenth Amendments to the United States Constitution, and under the

common law of the Commonwealth of Pennsylvania, against Montgomery County, Lower

Merion Township, and individual police and fire personnel in their individual capacities.

Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory

provision.  Plaintiff further invokes the pendent jurisdiction of this Court, provided by 28 U.S.C.

§ 1367, to entertain claims arising under state law.

**PARTIES**

2.      Plaintiff MICHELE OWEN BLACK, at all times relevant to this Complaint, is and was a United States citizen, and a resident of the State of California.

3.      Defendant MONTGOMERY COUNTY, at all times pertinent to this Complaint, is a political subdivision of the Commonwealth of Pennsylvania, and owns, operates, manages, directs and controls the Montgomery County Detective Bureau, which employees Defendant Fallon.

4.      Defendant LOWER MERION TOWNSHIP, at all times pertinent to this Complaint, is a political subdivision of the Commonwealth of Pennsylvania, and owns, operates, manages, directs and controls the Lower Merion Police and Fire Departments, which employees Defendants Henry, McGarvey, and Hand.

5.      Defendants FALLON, HAND, McGARVEY, HENRY and GARNER, at all times pertinent to this Complaint, were employed by Montgomery County or Lower Merion Township, and were acting under color of state law, pursuant to official policy, custom or practice of Montgomery County and/or Lower Merion Township, and/or its Police and Fire Departments. They are being sued in their individual capacities.

6.      Defendant POMPONIO, at all times pertinent to this Complaint, was employed by the Pennsylvania State Police, and was acting under color of state law, as an agent of Montgomery County and/or Lower Merion Township, and/or its Police and Fire Departments.  He is being sued in his individual capacity.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### BACKGROUND

7.      At the time of the incident that is the subject of this Complaint, Plaintiff Michele Owen Black, was a 55-year-old woman, who grew up in a home owned by her mother, Paula Owen, and late father, located in Lower Merion Township, Montgomery County, at 1401 Spring Mill Road, Gladwyne, PA.

8.      The residence was a one hundred-and-five-year-old, three-story structure that was lovingly renovated and maintained during the forty three years that it was in Plaintiff's family.

9.      Ms. Paula Owen sold the home and the closing was scheduled for November 30, 2012.

10.     The buyers, however, could not get home owner's insurance unless the old "knob and tube" wiring, which created a fire hazard, was upgraded with modern wiring.

11.     In order to have time to accomplish the wiring upgrade before they moved in, the buyers asked Ms. Owen to move up the closing date to November 19, 2012.

12.     Ms. Paula Owen kindly agreed to the new date despite the fact that this made the moving out process in a timely fashion more difficult.

13.     Therefore, at the closing, the buyers and Ms. Paula Owen entered into a post settlement possession addendum, which allowed Ms. Owen to remove her possessions from the house, while allowing the buyers' contractor to begin the electric and plumbing work.

14.     Plaintiff flew from her home in California on November 3, to help her mother pack and remove a lifetime of personal property out of the house.

15.     On November 20, 2012, the buyers' electrical contractor, Generation 3 Electric Company, was working at the residence upgrading the old knob and tube wiring, which included tracing wires and testing every outlet.

16.    In a third floor bedroom there was a window seat/sill area which contained a 220 volt outlet for an air conditioner (not present at the time of the incident), and therefore, the outlet was not in use.

17.    This 220-volt outlet did not have knob and tube wiring, but rather had been previously installed using to modern non-metallic sheathed (Romex) wiring.

## FIRE

18.    On November 21, 2012, at approximately 3:15 PM a fire broke out in the third floor middle bedroom.

19.    The fire created an evident 'V' pattern of fire damage extending from the base and right side of the outlet in the window sill, and extended upward and outward toward the right upper side of the window sill. (*See* photographs below).





20.     The fire spread upward and outward to the left hand side of the window and spread across the seat of window sill to combustible materials located on the window sill.

21.     The heaviest amount of char damage to the window sill surrounding the window was to the left hand side of the window frame, which was located on the same side as the electrical outlet, and the 'V' burn pattern extended from the outlet toward the left side of the window.

22.     By the time the Gladwyne Fire Department arrived, the fire was extinguished by the Generation 3 contractors, who extinguished the entire fire prior to calling for help.

23.     At 4:04 PM, within 34 minutes of their arrival, the Gladwyne Fire Chief called the dispatcher and reported that it was an "electrical fire that spread to a window frame."

24.     During those 34 minutes, fire personnel threw burning debris out of a window, and broke through the walls and ceiling to ensure that the fire had not "extended' or spread to inside the wall. (*See* photographs below).





**DEFENDANT DEPUTY FIRE MARSHALL HAND**

25.    According to Defendant Deputy Fire Marshall Frank Hand, a fire technician and not a certified fire investigator, arrived within 5-6 minutes of the initial call which came at 3:27 PM, put on his fire gear and took his camera; Gladwyne Assistant Chief Remillard was already on the scene and Fire Chief Blaine Leis arrived.

26.    Defendant Hand did a "quick" (less than 5-minute) 360 degree walk around the house, took some pictures, and then went to the room to conduct a "deeper" investigation.

27.    Defendant Hand claimed that he could not determine that the fire was accidental, so he started looking around at the wall, and "came across the outlet."

28.    Defendant Hand acknowledged that he was "not an electrical expert by any means," so he took pictures of the outlet so that someone who was expert could determine if there was electrical damage to it.

29.    Despite his professed lack of expertise, Defendant Hand nevertheless undertook to participate in a disassembly of the outlet. (*See* photographs below).











30.    Despite irrefutable evidence that the interior of the 220- volt outlet sustained fire damage, and despite the clear "V" pattern of fire damage extending from the base and right side of the outlet, as well as his self-admitted lack of electrical knowledge, Defendant Hand did not preserve

any of the evidence including the electrical outlet, supporting brackets, electrical box and outlet cover.

31.    This evidence, if it had been inspected by a person with the requisite expertise was totally exculpatory, and its spoliation put Plaintiff in danger of being wrongfully convicted.

32.    Rather than preserve the evidence for proper evaluation, Defendant Hand claimed that he could not determine that the origin of the fire was accidental, and therefore, called in the police department, the County District Attorney's Office and the State Police for assistance.

33.    Defendant Hand, despite his admitted lack of electrical knowledge, nonetheless concluded that the fire was set intentionally by human hands, and then engaged in an investigation that was colored by this belief and was geared towards proving this result.

34.    Despite clear evidence to the contrary, having personally inspected the scene of the fire, and well documented by his photographs, Defendant Hand intentionally misrepresented his findings, indicating that he observed through the opening in the wall, an 18-inch long piece of wire tail extending out of the rear of the outlet box.

35.    Defendant Hand opined that because the piece of wire had been cut only 18 inches from the outlet, there was no power source to the outlet prior to the fire, thus he could not find an accidental cause for the fire.

36.    Defendant McGarvey was Defendant Hand's supervisor, personally witnessed the fire scene, assisted with the investigation, and thus, endorsed Defendant Hand's investigation.

**DEFENDANT STATE POLICE TROOPER THOMAS POMPONIO**

37.    Defendant State Trooper Thomas Pomponio is an "alternate deputy fire marshal" whose arson investigation experience consisted of taking basic fire investigation, building construction,

and basic electrical courses, as well as working with the full-time fire marshal; he has investigated no more than 40 fires.

38.    Defendant Pomponio received the call from Defendant Hand at approximately 4:30 PM and arrived at the home at approximately 5:30 PM.

39.    According to Defendant Pomponio, he first walked in the room, did a quick 360 of the room, and observed the outlet, which was pulled out and was still connected, *viz.* the wires were all still connected to the outlet, but it was away from the box; it had face damage to it, so heat had been heavy on the front of it, but the wiring in the back and everything was intact.

40.    Despite the fact that Defendant Pomponio had only a basic knowledge of electricity and not even electrical fires, he concluded that he did not see any signs of "damage or faults or anything" in the wiring behind.

41.    Defendant Pomponio stated that he "learned" that the wire had been cut previously, and that is when he and the others, Defendants Hand, McGarvey, and Fallon, ruled out that the outlet was the cause of the fire, and concluded that the fire was caused by an open flame.

42.    This conclusion was contrary to the clear evidence that he would have inspected, if he investigated the scene as he claimed.

43.    Defendant Pomponio stated that, during one of his fire investigations, he would typically go into the basement to inspect the electrical panel, but did not do so on this occasion because it was relayed to him that the electrical panel had been observed, although he did not know by whom.

44.    If Defendant Pomponio had followed his own protocol, he would have gone to the basement, inspected the electrical panels and observed evidence of an electrical surge, which would have confirmed that this was an electrical fire and not arson.

45.    Defendant Pomponio tailored his report to comport with Defendant Hand's and Defendant Fallon's conclusions, despite the clear evidence to the contrary.

**DEFENDANT DETECTIVE JOHN FALLON**

46.    Defendant Fallon, who is a certified fire investigator (CFI) by the International Association of Fire Investigators, arrived at the house at approximately 4:40 PM, and spoke with Defendant Hand and Defendant McGarvey.

47.    Defendant Fallon claimed that he looked at the fire patterns in the room, then examined the outlet, and concluded that all of the damage caused to the outlet was caused by heat and not by electricity.

48.    Defendant Fallon determined that the outlet was not "energized" at the time of the fire, and therefore, he concluded that the fire was incendiary.

49.    Defendant Fallon's conclusion was contrary to the readily apparent evidence that the outlet was, in fact, energized, and that the damage to the outlet was caused by an internal heat source consistent with an electrical fire.

50.    In concluding that there was no electricity running to the outlet, Defendant Fallon took the word of the electrician, Generation 3 supervisor Mike Janiszewski rather than rely on his own investigation.

51.    During a fire investigation, Defendant Fallon would normally go into the basement and inspect closely the panel box and the electrical service, but claimed that he did not do so on this occasion because he accepted what Janiszewski told him.

52.    Janiszewski claimed that he determined that the wiring to the outlet in question was not functional; and that he had traced it down to the panel, found that the breaker it had been on was

in the off or tripped position; and therefore, that was one of the first circuits that was cut out of the panel and safely removed.

53.    Defendant Fallon accepted Janiszewski's and the other electricians' word because they could give him better information about the electricity than he was going to find out himself, because they know more about that "stuff" than he did.

54.    If Defendant Fallon had followed his own protocol, he would have gone to the basement, inspected the electrical panel and observed evidence of an electrical surge, which would have confirmed that this was an electrical fire and not arson.

55.    Fitting the evidence to their theory, rather than the other way around, a box of matches that was found on another window sill in the room, caused Defendants Fallon, Pomponio and Hand, to assume that these matches were used to start the fire, and they attempted to use the matches to get Plaintiff to admit to starting the fire.

56.    Despite seizing the box of matches as evidence, it was never tested for DNA or fingerprint identification, and was never analyzed to determine whether the match strike pad had been used.

**FAILURE TO INVESTIGATE**

57.    Defendants Fallon, Pomponio, Hand, and McGarvey completely ignored evidence that this was a textbook or classic case of an electrical fire caused by *arc tracking across a carbonized path.*

58.    Defendants Fallon, Pomponio, Hand, and McGarvey engaged in "negative corpus" methodology in investigating the origin of this fire, which led them to erroneously bring the arson charges against Plaintiff, in deliberate indifference to the truth.

59.    "Negative corpus" is short for *negative corpus delicti* and indicates the lack of objective proof of a crime.

60.    The negative corpus method allows for the process of elimination in determining the ignition source for a fire by eliminating all ignition sources and concluding that the ignition source is the one that cannot be eliminated despite the lack of affirmative evidence.

61.    The negative corpus method has been repudiated by the National Fire Protection Association (NFPA) which sets the scientifically accepted standards for conducting fire investigations.

62.    NFPA 921 states that where all hypothesized causes have been eliminated and there is no hypothesis that is supported by the facts, the ONLY choice is to opine that the causation is undetermined; in other words, it is improper to opine about a specific ignition source that has no evidence to support it even though all other hypothesized sources were eliminated.

63.    To eliminate a possible ignition source, the hypothesis must be tested scientifically.

64.    Defendants Fallon, Pomponio, Hand, and McGarvey intentionally failed to process and preserve the evidence; intentionally failed to scientifically test their hypotheses, and otherwise intentionally failed to engage in common sense analysis that resulted in using the repudiated negative corpus methodology.

65.    This, in turn, led Defendants to focus on Plaintiff as an arsonist at which point the "investigation" became an exercise in building a case against Plaintiff instead of finding the true ignition source.

66.    Defendant Hand failed to allow for the proper testing of the hypothesis that this was an electrical fire when he disassembled the outlet receptacle in the first place, and then failed to photograph all of its component parts, front and back.

67.     These Defendants failed to preserve for further inspection and testing the outlet, its component parts or any other items as evidence, in violation of established fire investigation protocol embodied in the National Fire Protection Association (NFPA), directive 921, as well as basic police protocol in gathering evidence at a crime scene.

68.     These Defendants, each of whom was self-admittedly not an expert in electricity or electrical fires, did not submit the evidence that remained at the scene of the fire to an electrical expert for further review and evaluation.

69.     Defendants Fallon, Pomponio, Hand, and McCarvey, following the discovery of a box of matches, failed to test the hypothesis that these matches were used to set the fire by searching for a burnt match in the debris.

70.     These Defendants failed to submit the box of matches for fingerprint or DNA analysis to determine who may have held the box; and they failed to closely examine the striker patch to determine whether it had ever been used.

71.     Defendants Fallon, Hand, Garner, Henry and Pomponio interviewed the electricians, and other persons present, but in a fashion and with a bias to establish the Plaintiff was in the fire room shortly before the fire started.

72.     The electrician supervisor Michael Janiszewski claimed that he was working in the basement, pulling out knob and tube circuits and pulling new wires to the electric panel.

73.     Janiszewski claimed further that he heard a faint alarm but did not pay it any attention until he checked on his workers on the second floor, where he asked if they knew what the alarm was or if they had cut a wire perhaps to a burglar alarm.

74.     Janiszewski claimed that he followed the sound to the third floor where he discovered the fire.

75.     According to testimony, Janiszewski put water on the fire while electrician Michel Summers called 9-1-1.

76.     Electrician Summers, in turn, claimed he was on the third floor using the bathroom, when he heard a rustling noise in the fire room as he walked past the open door, but did not see Plaintiff.

77.     Defendants Fallon, Pomponio, Hand, and McGarvey accepted Janiszewski's story at face value, and did not test any of his assertions.

78.     These Defendants did not go into the basement and inspect the electric panel to check the veracity or accuracy of the electrician's story;

- nor did they question Janiszewski why he allegedly ripped out an already upgraded circuit that was NOT knob and tube;

- they did not ask him why he attempted to put out a hot, smoky fire, rather than immediately call 9-1-1;

- they did not ask him why he did not order his employees to exit the home immediately for their safety.

79.     Defendants did not question or test how Janiszewski heard the alarm from the basement but the workers on the second floor paid it no notice; strongly suggesting that something happened in the basement that led Janiszewski to check out if there was a problem on the upper floors.

80.     These Defendant investigators did not question the electricians about the fact that they were working at the residence without the necessary electrical permit, as required by law, a fact which provided them with a strong motive to fabricate a story that would make it impossible for them to be responsible for causing an electrical fire and costing the electricians their jobs.

81.    Defendants engaged in a classic case of "expectation bias," allowing their bias to color their findings rather than letting the findings dictate the result, all in an effort to point the blame on Plaintiff and charge her with arson.

**INTERROGATION OF PLAINTIFF**

82.    Defendants Fallon, Pomponio, Hand, Garner and Henry questioned the four electricians, and the realtor who had arrived with three movers shortly before the fire broke out.

83.    The entire investigation and interview process took approximately five hours.

84.    Plaintiff was interrogated last and for the longest time among the interviewees, in large part, because she was already a suspect when she was subjected to questioning by Defendants Fallon, Pomponio, Hand, Garner and Henry.

85.    The Defendants' theory was that, without any motive and therefore, for absolutely no reason whatsoever, Plaintiff set a fire to her possessions at a window sill directly in front of an open door, in plain view of anyone walking by, with matches that she then walked to the far end of the room, placed on the second windowsill (which is not in view of the open door), and then walked downstairs, to greet the realtor who she was expecting and had just arrived.  (See diagram of room below).



86.    The interviews of the electricians and other witnesses were either not detailed, and either omitted important information or were not reduced to writing altogether.

87.    Plaintiff was advised that she was not free to leave the premises until she was questioned by police, and was escorted by police to and from the bathroom.

88.    When it was Plaintiff's turn to be questioned, she was told to follow an officer to the third floor and was lead to a room, with Defendants Fallon and Henry and two or three other police officers, including Defendants Pomponio and Garner, and including one of them stationed at the entrance door.

89.    Plaintiff told the Defendants that she was exhausted from not having slept in 36 hours and hungry from not having eaten since the day before, was never given her *Miranda* warnings and was not told that she was free to leave.

90.    The criminal court held as a matter of fact, based upon testimony, that Defendants subjected Plaintiff to a custodial interrogation, without giving Plaintiff *Miranda* warnings.

91.    During the interrogation, Defendants immediately accused Plaintiff of setting the fire, causing Plaintiff to ask Defendant Fallon why he believed the electricians' claims that they had nothing to do with the cause and origin of the fire, but did not believe her; to which Defendant Fallon replied that the electricians stated their work on the afternoon of November 21st was confined to the second floor and basement, and that the electricians stated they were working together.  They stated that none of them did anything to cause a fire, and they vouched for each other.

92.    Defendants ignored Plaintiff's response that she remembered one of the electricians coming into the room on the third floor and going near an outlet (on the wall to her back), while Plaintiff was at the windowsill sorting through things; and that the electricians often came up to the third floor, walked to the end of the hall (towards the bathroom), turned left, into the bedroom to take the stairs to the attic, where they worked on electrical wires, suggesting that it made more sense that an electrician was headed toward the attic, than to the bathroom, if he were on the third floor.

93.    Moreover, when Plaintiff asked Defendant Fallon why an electrician would walk to the third floor to use a bathroom when there were two bathrooms on the second floor, he tried to intimidate Plaintiff by harshly responding, "We're asking the questions!  You need to answer them!"

94.    Plaintiff was interrogated for a longer time than Defendants Fallon and Henry claimed, and attributed statements to Plaintiff that were not reflected in the statement that she signed.

95.    The interrogation ended with Defendant Fallon telling Plaintiff, "Suppose you had kids upstairs in your house.  Then all of the kids but one came downstairs.  Later, the last one came down.  Shortly after, a fire was discovered.  Even if the last kid to come downstairs said he didn't start the fire, wouldn't you blame him?"   Plaintiff replied, "I would ask him if he knew how the fire might have started.  I would certainly put my faith in the experts, expecting them to investigate and discover the true source of the fire."   Fallon answered, "We think you started the fire.  We could arrest you now, but we won't."

**MATERIAL FALSEHOOD AND OMISSIONS**

96.    Defendant Fallon swore out the following affidavit:

* * * * *

On Wednesday, November 21, 2012 at 3:27 PM, Lower Merion Police and Fire units were dispatched to 1401 Spring Mill Road, Gladwyne, Lower Merion Township on a report of a house fire.  Officer Kirk Gardner, LMPD arrived on location at 3:31 PM and observed smoke coming from a third floor window.  The Gladwyne Fire Company arrived on location at 3:34 PM Assistant Chief John Remillard located a fire in the window well of a third floor dormer.  The fire was quickly extinguished.

1401 Spring Mill Road is a three story residence situated on a wooded lot which occupies approximately three (3) acres on the northeast corner of Spring Mill and Conshohocken State Roads in the Gladwyne section of Lower Merion Township, Montgomery County.  The fire was confined to a room located in northeast corner of the third floor.

Lower Merion Chief Fire Officer Charles McGarvey also responded to the scene along with Deputy Fire Marshal Frank Hand.  At approximately 4:15 PM that same date, Chief McGarvey requested assistance with the investigation of this fire and Detective Henry, Detective Fallon and Trooper Robert Pomponio, Pennsylvania State Police Fire Marshal, were assigned.

Detectives Henry and Garner interviewed Joshua Trisdorfer, William Warren and Michel Summers.  All are employed by Generation 3, an electrical contractor, which was replacing wiring and doing other electrical work in the home.  A third employee of this company, Michael Janiszewski, was interviewed by DFM Hand.  All three employees stated that they had been doing work in the room, in which

20

the fire started, earlier in the day.  During the afternoon hours, their work was confined to the second floor and the basement.

Janiszewski stated that he was en route to the second floor of the house, when he heard an alarm.  He continued to the third floor and observed a fire, in the area of a window on the east side of the home.  He yelled "fire" and went to fill a can with water.  He was assisted by William Warren and Trisdorfer, while Summers called 9-1-1.  They were able to extinguish the fire and then went outside to wait for fire personnel.  According to Janiszewski, he did not observe anyone else on the third floor when he discovered the fire.  Trisdorfer, Warren and Summers echoed this account.  Summers added that he went to use the third floor bathroom between 2:50 and 3:00 PM.  When he was heading back down the stairs, he heard someone in the "fire room".  According to Summers, he did not see anyone, but stated that it sounded like someone was rummaging through some papers or bags.

Maureen Algeo, a realtor with Prudential/Fox & Roach stated that she arrived at the house at 3:15 PM, just as the movers were arriving.  When she entered the home, she observed Michele Owen BLACK walking down the stairs towards the foyer.  About ten minutes after Algeo arrived, the fire was discovered.

Lastly, we interviewed BLACK.  BLACK is the daughter of the previous owner, Paula Owen.  BLACK had been on scene to remove some small, personal items that had been left behind by her mother after she moved out.  BLACK stated that she arrived at 1401 Spring Mill Rd between 2:00 and 3:00 PM.  She was going through some bags in the fire room, when Algeo arrived.  This was just a few minutes before the fire was discovered, according to BLACK.

While speaking to us, BLACK muttered a mostly unintelligible sentence ending with the word "matches".  When asked to repeat what she said, BLACK changed the subject. During this interview, I showed BLACK a box of matches that were found in the fire room and asked if there was any reason that I would find her fingerprints on the box. BLACK answered that she probably touched the box at some point, therefore it would be likely that her prints would be on the box.

Detective Fallon and Trooper Pomponio are experts in determining the origin and cause of fires. Following a thorough, systematic and exhaustive examination of the scene, it was both Detective Fallon's and Trooper Pomponio's opinion that this is an incendiary fire, that is, intentionally set by human hands.   These investigators believes [sic] that the perpetrator(s) used an open flame, possibly a match, to ignite the ordinary combustibles present at or on the window sill of the dormer window.  Detective Fallon and Trooper Pomponio concur that this fire does not appear to have burned for an extended period of time.  While it is impossible to estimate the exact burn time, given the fuel load and construction of the building, it is evident that the fire did not burn long before it was at least partially extinguished.  The fire did not spread to any structural members and did

not fully consume all of the potential fuel sources located on top of the window sill.

Due to the fact that Detective Fallon and Trooper Pomponio determined that this fire had been intentionally set by a human and that it was likely caused by an open flame; that Michele Owen BLACK admittedly was the only person in the room, in which the fire occurred and that she exited this room shortly before the fire was discovered; and lastly, she stated that it was likely that her fingerprints would be found on a matchbook, which was located in the (fire) room; it was our conclusion that Michele Owen BLACK intentionally set this fire, with intent or reckless disregard for the potential damage to the property or the persons working inside the premises.

97.    The affidavit of probable cause contained material falsehoods and had material omissions. *Inter alia,* the affiant:

a.    Failed to mention that the fire started right at a 220-volt outlet and created an evident 'V' pattern of fire damage extending from the base and right side of the outlet in the window sill, and extended upward and outward toward the right upper side of the window sill, and in fact, never mentioned the outlet;

b.    Failed to state that the Gladwyne Fire Chief concluded that this was an electrical fire that spread to the window sill;

c.    Failed to state that the initial investigator took apart the outlet which was clearly indicative of his suspicion that this was an electrical fire;

d.    Failed to include or refer to photographs of the outlet which showed that it was clearly damaged, regardless of the source – electrical fire or heat from the fire.

e.    Failed to state that they never tested the outlet to determine whether it was connected to live wires, but rather accepted the word of the supervising electrician that the line was dead, and that he had ripped out the circuit.

f.    Failed to state that the electricians were there in the first place to replace one hundred year-old knob and tube wiring for the very reason that such wiring is a fire hazard;

g.    Failed state that he and the other fire investigators did not check the circuit panel in the basement, as they did in every other fire investigation, to verify that the electrician was telling the truth about the circuit being dead;

h.      Failed to state that the electricians were working unlawfully without a permit, were not questioned about that fact, and still continued to work without a permit up to the date of the affidavit was sworn out;

i.      Failed to state that the investigators did not preserve the outlet or any evidence in clear violation of established fire and police investigation protocol, and thus had engaged in intentional spoliation of evidence;

j.      Failed to state that Defendant Pomponio is not a certified fire investigator and therefore is not an expert as averred in the affidavit;

k.      Failed to state that Defendant Pomponio and the affiant did NOT engage in a "thorough, systematic and exhaustive examination of the scene;

l.      Omitted important facts about Plaintiff and failed to accurately state the truth of the investigators' interrogation of Plaintiff, including that they immediately accused her of setting the fire with matches; and failed to include the truth of what Plaintiff said about "matches."   These omissions and falsehoods include:

     i.      Plaintiff grew up in this home, and told Defendants that she loved the home;

     ii.      As a family, they worked together to restore and maintain the home;

     iii.      The home was a source of joy to Plaintiff: she was married in the home, and often brought her three children to the "family home" to celebrate various occasions together;

     iv.      Plaintiff believed her recently deceased father was in heaven, and that he could look down upon earth…and she would never deliberately do anything to cause him or her mother embarrassment or pain;

     v.      She would not destroy the property she and her parents all loved so much, and that her family found it comforting that her mother had sold the home to another Temple University physician's family;

     vi.      Plaintiff was told to stop talking about the new owners and to tell them how and why she started the fire, and engaged in the following exchange:

          Q.  Did you a smoke cigarette?  A.  No, I don't smoke.

          Q.  Did you smoke anything?   A. No, I don't smoke.

Q.  Did you light a match to light a candle?  A.  Before the first day of
my mother's estate sale last week, I lit a fragrant holiday candle.

Q.  Did you light a match to light a candle to read a book?  A.  No.

Q.  Did you light a match to read pages in the books which were
placed on the windowsill?  A.  No, I did not light a match to read a
page in a book. It was daylight when I placed the textbooks on the
windowsill that afternoon.  I had just begun looking through them
when [realtor] Maureen [Algeo] called up to me announcing her
expected arrival.  I left the textbooks on the windowsill while I went
downstairs to meet Maureen.

vii.        After sitting in silence for what seemed to be a long time, Plaintiff stated,
"I don't even have matches," prompting the following exchange:

Q.  What were you going to say?  A.  I don't even have matches.

Q.  Did you say matches?  A. Yes.  I don't have any matches.

Q.  If we find matches in that room, will your fingerprints be on them?
A.  It's probable.  It's likely that every item in that room was put there
by me."

viii.       Plaintiff held her hands out, with her palms facing up, and stated, "Test
my hands.  Wouldn't there be some residue on my hands, if I had struck a match
and lit a fire?" to which Defendant Fallon replied, "That's CSI and we're not CSI."

ix.        Defendant Henry handed Plaintiff a clip board, explained he had taken
some notes and wanted Plaintiff to review them and make corrections.

x.        Plaintiff began making changes, and almost immediately, one of the
Defendants said sarcastically, "She thinks she's a novelist!"

xi.        Embarrassed, Plaintiff stopped making corrections, signed Defendant
Henry's notes and handed the clipboard back to him.

xii.        The notes signed by Plaintiff omitted most of what is outlined above, and
particularly the discussion regarding the matches.

xiii.        As Plaintiff was escorted down the hall, and looked in the room, she asked
if the outlet could have caused the fire, and Defendant Fallon replied, "No.  We
think you started the fire."

xiv.        When Plaintiff asked "Why?", Defendant Fallon replied, "Because you
were the last one in the room."

24

m.    Failed to state that the matches were never submitted for fingerprint or DNA testing.

n.    Failed to apprise the magistrate that Defendants had engaged in "negative corpus" methodology that has been repudiated by the National Fire Protection Association (NFPA).

98.    Had a reasonable, neutral magistrate been provided with the complete and accurate recitation of the facts, and the proper way to conduct a fire investigation, the magistrate would not have found probable cause for Plaintiff's arrest.

99.    On November 21, 2012, at the conclusion of Plaintiff's interrogation, Defendant Fallon told Plaintiff that if she did not surrender herself to them at a later date, a warrant would be issued for her arrest and they would have the San Diego District Attorney's Office send a police officer to arrest her, and that she would remain in custody until she would be extradited, and then stay in jail until her arraignment.

100.    On December 17, 2012, an arrest warrant was issued for Plaintiff on various counts of Arson Endangering Persons (18 Pa. C.S.A. § 3301); risking catastrophe (18 Pa. C.S.A. § 3302), criminal mischief (18 Pa. C.S.A. § 3304), and recklessly endangering another person (REAP) (18 Pa. C.S.A. § 2705).

101.    On or about December 14, 2012, Plaintiff was contacted by Defendant Henry and informed that she needed to be in Lower Merion, PA the following week.

102.    On December 18, 2012, Plaintiff flew to Pennsylvania and, that same day, was required to appear at her arraignment on the above charges, at which time, bail was set at $50,000 unsecured bail, a condition of which required Plaintiff to appear at all subsequent proceeding as required.

103.    Plaintiff was then required to appear at the police station for fingerprinting and photographing, a process that took over an hour.

104.    On January 24, 2013, Plaintiff flew in from California for her preliminary hearing.

105.    On 03/13/2013, 04/12/2013, 05/21/2013, 07/11/2013, 08/08/2013, 08/23/2013, 10/07/2013 10/17/2013, 11/06/2013, 12/04/2013, 01/08/2014, 02/05/2014, 02/10/2014, and 03/05/2014, Plaintiff's case was listed for pre-trial conferences, hearings or trial listings, before which Plaintiff would receive a Court Notice indicating that if Plaintiff did not appear, a bench warrant would be issued for her arrest.

106.    Plaintiff flew in from California for all but two of these court proceedings, due to the caveat stated in the Court Notice that a failure to appear as required would result in a forfeiture of bail and the issuance of an arrest warrant.

107.    Plaintiff's presence was, of course, require at her trial, beginning on April 23, 2013.

**WITHHOLDING AND FABRICATION OF EVIDENCE**

108.    Plaintiff retained the service of John J. Lentini, CFI, D-ABC, an internationally-renown expert in the investigation of fire origins, who concluded that this was an electrical fire, and not arson.

109.    On March 25, 2014, Mr. Lentini reached out to Defendant Hand and offered to go over the photographs with him and discuss his findings.

110.    Mr. Lentini did not receive a response, and therefore, asked Plaintiff's criminal defense counsel to reach out to the assistant district attorney.

111.    On March 28, 2014, Plaintiff's criminal defense attorney sent an email to the then-assigned assistant district attorney and advised him that Mr. Lentini had opined that there was

NO way this was an arson; not that this is an issue on which reasonable experts could disagree, but that there was NO way this was arson.

112.    Plaintiff's counsel offered the assistant district attorney and his "experts" to sit down with Mr. Lentini and discuss the case.

113.    The assistant district attorney never responded to this offer, or Plaintiff's counsel's efforts to follow up, because, on information and belief, Defendant Fallon did not want to consider the evidence.

114.    On April 24, 2014, at the second day of trial, the assistant district attorney, Christopher Daniels, offered knowingly false testimony by introducing two photographs, C-2 and C-3 through Defendant Fallon, who testified that these photographs proved that there was no power to the outlet receptacle prior to the time of the fire.

115.    Defendant Fallon testified falsely that the cut wire with the end taped was done prior to the wall being opened up by fire personnel.  (see below photographs).





116.    Defendant Hand testified falsely that "behind the wall there was an opening, and where that electrical outlet for the air conditioner was, it was only 18 inches of wire.  It was cut."

117.    The photographs taken the same day of the fire clearly show that the wire was intact.

118.    Commonwealth exhibits C-2 and C-3 were never turned over to Plaintiff as part of mandatory discovery in the criminal case, but were sprung on defense counsel during Fallon's testimony.

119.    C-2 and C-3, unlike the other photographs that were taken and introduced at trial, were taken at night.

120.    On December 3, 2012, Defendant Fallon prepared a report in which he indicated that, on November 27, 2012, at 5:30 PM, he met the buyers (new owners) at the residence, and that the husband stated that the house was insured by State Farm and that he was not allowed to make any repairs in the fire room pending further insurance investigation.

121.    The buyer-husband stated further that the electricians removed the receptacle from the window well and taped up the exposed ends of the wire

122.    Per his report, Defendant Fallon took additional photographs which were downloaded to a CD and a copy was included in his file.

123.    Sunset on November 27, 2012, was at approximately 5:40 PM, and thus, it was dark out when Defendant Fallon took his photographs.

124.    At trial, the following exchange took place between the prosecutor and Defendant Fallon:

Q.  Detective, looking at the picture that's labeled  C-2.  On C-2 can you in that picture see the outlet that had been disassembled and pulled out?
A. Yes. That is in the lower center portion of that.  It's pretty plain to see in the photograph.

Q. That is to the left side of the window?
A. Left side of the window, yeah.

Q.  To the left of that it looks as though the fire department had removed some wall and ceiling?
A. That was broken out, and it is my presumption that the fire department broke that out to check for extension of fire into the wall, which was a pretty prudent thing to do, yes.

Q.  In that area section that had been removed, at least it appears there is a gray thin line from the top almost all the way --
A. It's electric wires.

Q. Did you examine them?  A. Yes, I did.

Q. What did you find?   A.  It's cut off and it's got electrical tape on it.

Q.  Paging forward to C-3 next.  On C-3, detective, what is depicted there?
A. Seems to me to be pretty much the same thing as C-2, except you have a harder time seeing the end of the electrical wire.  It sort of comes down and goes behind a wall stud, and then you can see it behind the wall stud.

Q.  Do you know what that wire would lead to?  A.  That wire went to the back of the receptacle.
Q.  Flipping forward to C-4 next, that is kind of a blurry shot, but what do you see in that picture?
A. That's the end of the wire with some black electrical tape on it.

29

125.    Defendant Fallon then testified that he was able to see the end of that wire that was coming out of that box, and that it was not operable, the electricity was cut off.

126.    On cross-examination, Defendant Fallon contended that C-2 and C-3 depicted the state of the wiring BEFORE that wall was ever broken into by the fire personnel, because, no fire department or law enforcement official would take the wire off of the back of that receptacle and put some tape on it and put it on the ground.

127.    Defendant Fallon obviously knew that his "expert" opinion that the photographs did not show "internal damage" to the outlet would not be believed, and therefore, attempted to use C-2 and C-3 to prove that there was no electricity running to the receptacle, which was the only way to poke a hole in what he expected to be Mr. Lentini's testimony.

128.    Defendant Fallon and ADA Daniels withheld C-2 and C-3 from Plaintiff until they presented their last witness of the trial (Fallon), after all the other Commonwealth witnesses had testified and could not be examined about these photographs.

129.    Defendant Fallon and ADA Daniels knew that the cutting of the wire was not done prior to the fire, but decided to present this evidence to deliberately deceive the jury in order to achieve a conviction, in the hope that the jury would reject Mr. Lentini's testimony that Fallon's testimony about the photographs was fraudulent, and that the fire's origin was electrical.

130.    When offered the opportunity to discuss the evidence with Plaintiff's expert, and thus, have a preview at the theory of criminal defense, ADA Daniels declined, deferring to Defendant Fallon's desire to let the jury decide.

131.    Defendant Fallon, as the only certified fire investigator in this case, set the policy of both Defendant Montgomery County and Lower Merion Township.

132.    On April 24, 2014, following a jury trial, in large part due to Mr. Lentini's testimony that refuted Defendant Fallon's testimony, Plaintiff Michele Owen Black was found not guilty of all charges by the jury which deliberated less than 40 minutes.

### COUNT I -- 42 U.S.C. § 1983
### MALICIOUS PROSECUTION – FOURTH AMENDMENT
### PLAINTIFF V. DEFENDANTS FALLON

133.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

134.    Defendant Fallon caused the initiation of criminal charges against Plaintiff without probable cause, and with malice, and thereby subjected Plaintiff to malicious prosecution in violation of her constitutional rights under the Fourth Amendment to the United States Constitution.

135.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer emotional pain and suffering.

### COUNT II -- 42 U.S.C. § 1983 CONSPIRACY
### MALICIOUS PROSECUTION – FOURTH AMENDMENT
### PLAINTIFF V. DEFENDANT FALLON

136.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

137.    Defendant Fallon, acting in concert and conspiracy with Defendants Pomponio, Hand, McGarvey, Garner, and Henry, caused the initiation of criminal charges against Plaintiff without probable cause, and with malice, and thereby subjected Plaintiff to malicious prosecution in violation of her constitutional rights under the Fourth Amendment to the United States Constitution.

138.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer injuries, including emotional pain and suffering.

### COUNT III -- 42 U.S.C. § 1983
### PROCEDURAL DUE PROCESS – FOURTEENTH AMENDMENT
### PLAINTIFF V. DEFENDANTS FALLON

139.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

140.    Defendant Fallon deliberately fabricated evidence, suppressed and/or destroyed exculpatory evidence thereby violating Plaintiff's rights to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

141.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer emotional pain and suffering.

### COUNT IV -- 42 U.S.C. § 1983 CONSPIRACY
### PROCEDURAL DUE PROCESS – FOURTEENTH AMENDMENT
### PLAINTIFF V. DEFENDANT FALLON

142.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

143.    Defendant Fallon, acting in concert and conspiracy with Defendants Pomponio, Hand, McGarvey, Garner, and Henry, deliberately fabricated evidence, suppressed and/or destroyed exculpatory evidence thereby violating Plaintiff's rights to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

144.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer emotional pain and suffering.

### COUNT V -- 42 U.S.C. § 1983 CONSPIRACY
### MALICIOUS PROSECUTION – FOURTH AMENDMENT
### PLAINTIFF  v. DEFENDANT HAND

145.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

146.    Defendant Hand, acting in concert and conspiracy with Defendants Fallon, Pomponio, McGarvey, Garner, and Henry, caused the initiation of criminal charges against Plaintiff without probable cause, and with malice, and thereby subjected Plaintiff to malicious prosecution in violation of her constitutional rights under the Fourth Amendment to the United States Constitution.

147.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer injuries, including emotional pain and suffering.

### COUNT VI -- 42 U.S.C. § 1983
### PROCEDURAL DUE PROCESS – FOURTEENTH AMENDMENT
### PLAINTIFF  v. DEFENDANT HAND

148.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

149.    Defendant Hand deliberately fabricated evidence, suppressed and/or destroyed exculpatory evidence thereby violating Plaintiff's rights to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

150.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer injuries including emotional pain and suffering.

### COUNT VII -- 42 U.S.C. § 1983 CONSPIRACY
### PROCEDURAL DUE PROCESS – FOURTEENTH AMENDMENT
### PLAINTIFF  V. DEFENDANT HAND

151.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

152.    Defendant Hand, acting in concert and conspiracy with Defendants Fallon, McGarvey, Garner, and Henry, deliberately fabricated evidence, suppressed and/or destroyed exculpatory evidence thereby violating Plaintiff's rights to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

153.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer emotional pain and suffering.

### COUNT VIII -- 42 U.S.C. § 1983 CONSPIRACY
### MALICIOUS PROSECUTION – FOURTH AMENDMENT
### PLAINTIFF  V. DEFENDANT POMPONIO

154.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

155.    Defendant Pomponio, acting in concert and conspiracy with Defendants Fallon, Hand, McGarvey, Garner, and Henry, caused the initiation of criminal charges against Plaintiff without probable cause, and with malice, and thereby subjected Plaintiff to malicious prosecution in violation of her constitutional rights under the Fourth Amendments to the United States Constitution.

156.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer injuries including emotional pain and suffering.

**COUNT IX -- 42 U.S.C. § 1983 CONSPIRACY**
**PROCEDURAL DUE PROCESS – FOURTEENTH AMENDMENT**
**PLAINTIFF v. DEFENDANT POMPONIO**

157.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

158.    Defendant Pomponio, acting in concert and conspiracy with Defendants Fallon, Hand, McGarvey, Garner, and Henry, deliberately fabricated evidence, suppressed and/or destroyed exculpatory evidence thereby violating Plaintiff's rights to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

159.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer emotional pain and suffering.


**COUNT X -- 42 U.S.C. § 1983 CONSPIRACY**
**MALICIOUS PROSECUTION – FOURTH AMENDMENT**
**PLAINTIFF v. DEFENDANT MCGARVEY**

160.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

161.    Defendant McGarvey acting in concert and conspiracy with Defendants Fallon, Pomponio, Hand, Garner, and Henry, caused the initiation of criminal charges against Plaintiff without probable cause, and with malice, and thereby subjected Plaintiff to malicious prosecution in violation of her constitutional rights under the Fourth Amendments to the United States Constitution.

162.    As a direct and proximate cause of Defendants' actions, Plaintiff suffered and continues to suffer emotional pain and suffering.

**COUNT XI -- 42 U.S.C. § 1983 CONSPIRACY**
**PROCEDURAL DUE PROCESS – FOURTEENTH AMENDMENT**
**PLAINTIFF  V. DEFENDANT MCGARVEY**

163.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

164.    Defendant McGarvey, acting in concert and conspiracy with Defendants Fallon, Hand, Pomponio, Garner, and Henry, deliberately fabricated evidence, suppressed and/or destroyed exculpatory evidence thereby violating Plaintiff's rights to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

165.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer emotional pain and suffering.

**COUNT XII -- 42 U.S.C. § 1983 CONSPIRACY**
**MALICIOUS PROSECUTION – FOURTH AMENDMENT**
**PLAINTIFF  V. DEFENDANT GARNER**

166.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

167.    Defendant Garner, acting in concert and conspiracy with Defendants Fallon, Pomponio, Hand, McGarvey, and Henry, caused the initiation of criminal charges against Plaintiff without probable cause, and with malice, and thereby subjected Plaintiff to malicious prosecution in violation of her constitutional rights under the Fourth Amendment to the United States Constitution.

168.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer emotional pain and suffering.

## COUNT XIII -- 42 U.S.C. § 1983 CONSPIRACY
## PROCEDURAL DUE PROCESS – FOURTEENTH AMENDMENT
## <u>PLAINTIFF  V. DEFENDANT GARNER</u>

169.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

170.    Defendant Garner, acting in concert and conspiracy with Defendants Fallon, Hand, McGarvey, Pomponio, Garner, and Henry, deliberately fabricated evidence, suppressed and/or destroyed exculpatory evidence thereby violating Plaintiff's rights to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

171.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer emotional pain and suffering.

## COUNT XIV -- 42 U.S.C. § 1983 CONSPIRACY
## MALICIOUS PROSECUTION – FOURTH AMENDMENT
## <u>PLAINTIFF  V. DEFENDANT HENRY</u>

172.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

173.    Defendant Henry, acting in concert and conspiracy with Defendants Fallon, Pomponio, Hand, McGarvey, and Garner, caused the initiation of criminal charges against Plaintiff without probable cause, and with malice, and thereby subjected Plaintiff to malicious prosecution in violation of her constitutional rights under the Fourth Amendments to the United States Constitution.

174.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer emotional pain and suffering.

**COUNT XV -- 42 U.S.C. § 1983 CONSPIRACY**
**PROCEDURAL DUE PROCESS – FOURTEENTH AMENDMENT**
**PLAINTIFF V. DEFENDANT HENRY**

175.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

176.    Defendant Henry, acting in concert and conspiracy with Defendants Fallon, Pomponio, Hand, McGarvey, and Garner, deliberately fabricated evidence, suppressed and/or destroyed exculpatory evidence thereby violating Plaintiff's rights to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

177.    As a direct and proximate cause of Defendant's actions, Plaintiff suffered and continues to suffer injuries, including emotional pain and suffering.

**COUNT XVI -- 42 U.S.C. § 1983**
**MONELL**
**PLAINTIFF V. DEFENDANT MONTGOMERY COUNTY**

178.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

179.    Defendant Montgomery County has encouraged, tolerated, ratified and has been deliberately indifferent to the following patterns, practices and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

    a.  Unlawful detentions and interrogations by police officers;

    b.  The proper exercise of police powers, including but not limited to the use of false information to obtain arrest and search warrants, fabrication of evidence, loss and/or spoliation of evidence, unlawful arrest, malicious prosecution and unlawful detention;

    c.  The improper use of repudiated methodology in arson investigation, and the proper methodology in the gathering and preservation of evidence, as well as the consideration of exculpatory evidence.

180.    Defendant Montgomery County failed to properly train, supervise or discipline officers assigned to arson investigations, including but not limited to:

(a)  the duty to provide only truthful information in securing search and arrest warrants;

(b)  the duty to disclose exculpatory evidence in criminal cases;

(c)  the duty to gather and preserve evidence;

(d)  the duty to provide accurate and truthful information to the prosecutor's office; and

(e)  the fabrication of evidence against an accused to justify their illegal actions and conduct.

181.    By these actions, Defendant Montgomery County has deprived Plaintiff of her rights secured by the United States Constitution in violation of 42 U.S.C. § 1983.

## COUNT XVII -- 42 U.S.C. § 1983
### MONELL
### PLAINTIFF  V. DEFENDANT LOWER MERION TOWNSHIP

182.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

183.    Defendant Lower Merion Township has encouraged, tolerated, ratified and has been deliberately indifferent to the following patterns, practices and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

a.   Unlawful detentions and interrogations by police officers;

b.   The proper exercise of police powers, including but not limited to the use of false information to obtain arrest and search warrants, fabrication of evidence, loss and/or spoliation of evidence, unlawful arrest, malicious prosecution and unlawful detention;

c.   The improper use of repudiated methodology in arson investigation, and the proper methodology in the gathering and preservation of evidence, as well as the consideration of exculpatory evidence.

184.    Defendant Lower Merion Township failed to properly train, supervise or discipline officers assigned to arson investigations, including but not limited to:

(a) the duty to provide only truthful information in securing search and arrest warrants;
(b) the duty to disclose exculpatory evidence in criminal cases;

(c) the duty to gather and preserve evidence;

(d) the duty to provide accurate and truthful information to the prosecutor's office; and

(e) the fabrication of evidence against an accused to justify their illegal actions and conduct.

143    By these actions, Defendant Lower Merion Township has deprived Plaintiff of her rights secured by the United States Constitution in violation of 42 U.S.C. § 1983.

## COUNT XVIII -- STATE CLAIM
### FALSE IMPRISONMENT
### PLAINTIFF V. DEFENDANTS FALLON, POMPONIO, HAND, McGARVEY, GARNER AND HENRY

144.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth herein at length.

145.    By the conduct set forth above, including causing Plaintiff to be physically confined, and interrogated in a custodial situation where she was not free to leave, all without legal justification or cause, Defendants, jointly and individually, caused and intended to cause Plaintiff to be confined.

146.    As a result of the conduct described above, Plaintiff was in fact arrested and confined without probable cause, and without her consent and against her will.

147.    Defendants, jointly and individually, without legal cause or justification, used physical force, threats, and actual or apparent physical barriers to overcome Plaintiff and effect a confinement.

148.     As a direct and proximate result of the aforementioned conduct, Plaintiff suffered and continues to suffer injuries including emotional pain and suffering.

### COUNT XIX -- STATE CLAIM
### MALICIOUS PROSECUTION
### PLAINTIFF  V. DEFENDANTS FALLON, POMPONIO, HAND, MCGARVEY, GARNER AND HENRY

149.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth herein at length.

150.     By the conduct set forth above, Defendants, individually and jointly, intentionally, recklessly, and maliciously caused a criminal prosecution to be initiated against Plaintiff.

151.     Plaintiff was arrested and imprisoned and had to endure the prospect of going to trial in order to prove her innocence.  Defendants acted with malice and furthered the prosecution of Plaintiff by providing false information, and/or withheld truthful information and refused to listen to what would prove to be the correct determination of the cause of the fire, all of which if known would have resulted in no prosecution of Plaintiff.

152.     The criminal charges against Plaintiff were terminated in her favor following the a jury verdict of not guilty.

153.     As a direct and proximate result of the aforementioned conduct, Plaintiff suffered and continues to suffer injuries, including emotional pain and suffering.

### COUNT XX -- STATE CLAIM
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### PLAINTIFF  V. DEFENDANT FALLON, POMPONIO, HAND, MCGARVEY, GARNER AND HENRY

154.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth herein at length.

155.     By engaging in the offensive conduct described above, Defendants, individually and jointly, intentionally, recklessly and maliciously caused severe emotional distress to Plaintiff.

156.    This conduct was extreme and outrageous and was designed to cause physical harm, grief, shame, humiliation, embarrassment, and anger.

157.    As a direct and proximate result of the aforementioned conduct, Plaintiff suffered physical injury and pain, and continues to suffer emotional distress, humiliation, mental pain and suffering.

## DAMAGES

158.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint as set forth above.

159.    Plaintiff suffered economic losses including, but not limited to monetary and property loss.

160.    The conduct of Defendants Fallon, Pomponio, Hand, McGarvey, Henry and Garner was outrageous, in that it was malicious, wanton, willful, or oppressive, or showed reckless indifference to the interests of Plaintiff, and therefore, warrants the imposition of punitive damages.

## RELIEF

**WHEREFORE**, Plaintiff Michele Owen Black requests the following relief:

a.    compensatory damages;

b.    punitive damages against the individually named defendants;

c.    reasonable attorney fees and costs under Counts I - XVII; and

d.    such other relief as appears reasonable and just.

e.    Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**James, Schwartz & Associates, P.C.**
1500 Walnut Street – 21st Floor
Philadelphia, PA 19107
(215) 751–9865

By:     */s/*    Jonathan James   JJJ6405
        JONATHAN J. JAMES, ESQUIRE
        Attorney I.D. #64534
        jjames@civilrightspa.com

        */s/*    Michael Schwartz MCS6449
        MICHAEL C. SCHWARTZ
        Attorney I.D. #39475
        mschwartz@civilrightspa.com

        ATTORNEYS FOR PLAINTIFF

Date:   June 5, 2015